**INLAND MORTGAGE CAPITAL CORPORATION, Plaintiff,**

v.

**CHIVAS RETAIL PARTNERS, LLC, et al., Defendants.**

No. 11 C 6482.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 24, 2012.

William J. McKenna, Jr., Thomas Charles Hardy, Foley & Lardner, Chicago, IL, Attorneys for Plaintiff.

James Kenneth Borcia, Tressler LLP, Chicago, IL, Attorneys for Defendants.

*MEMORANDUM OPINION AND ORDER*

MILTON I. SHADUR, Senior District Judge.

Even in the time before Noah's flood when this Court was still in the private practice of law, it regularly urged the other partners and associates in its small law firm (whether engaged in the transaction practice or in litigation) to place the question of choice of law at the very top of their mental checklists. That principle is no less true today, and this case provides a graphic demonstration of its potency.

Here Inland Mortgage Capital Corporation ("Inland") has sued Arizona limited liability company Chivas Retail Partners, LLC, Tim Dollander (both as an individual and as Trustee of the TJD Separate Property Trust) and Walter Brown, Jr. (both as an individual and as Trustee of Walter J. Brown, Jr. Revocable Trust)(collectively "Guarantors") through what it has labeled as its Complaint for Breach of Guaranty Agreement, invoking federal subject matter jurisdiction on diversity of citizenship grounds. That clear message as to the nature of this action is reinforced by the attachment of the parties' June 6, 2007 Loan Guaranty Agreement ("Guaranty"), Paragraph 26 of which begins:

> This Guaranty Agreement has been made and delivered by the undersigned in the State of Illinois and shall be construed for all purposes and enforced in accordance with the laws of the State of Illinois. . . .

Yet Guarantors seek dismissal of the action on claim preclusion grounds and issue preclusion grounds under *Georgia* law in attempted reliance on a mortgage foreclosure action pursued in that state

against the real estate that secured the $59.670 million loan that is the subject of the Guaranty. This opinion will first address why Inland is right (and Guarantors are thus dead wrong) by reason of Guarantors' detailed and unequivocal undertakings in the Guaranty, and it will then turn to the bogus nature of Guarantors' efforts to extricate themselves from the toils of those voluntary and deliberate contractual commitments.

As to the Guaranty itself, in light of the multimillion dollar amount of the underlying loan it is hardly surprising that the Guaranty document contains all of the provisions typical of unconditional guaranties in major commercial transactions—provisions that unambiguously sew up the express personal liability of Guarantors for the indebtedness that is the subject of the guaranty. Lest there be any doubt in that respect, the Guaranty itself is attached to and made a part of this opinion, just as it has been made an integral part of Inland's Complaint. And without seeking to be exhaustive, the following sampling demonstrates why Guarantors' effort to squirm out from under their deliberately undertaken personal obligations is totally unpersuasive:

1. At the outset, two of the Guaranty's recitals confirm the intent of the parties:

> WHEREAS, Lender is willing to extend the Loan only on the condition that Guarantor,[1] irrevocably and unconditionally, fully guarantees to Lender the full and prompt payment and performance of the Obligations (defined below) as herein provided; and

> WHEREAS, Guarantor is willing to irrevocably and unconditionally, fully guarantee the Obligations, pursuant to the terms of this Guaranty Agreement.

2. Guaranty § 2 sets out the particulars of the obligations under the Loan Documents of the "Borrower" (Harbins Crossing TC, LLC ["Harbins"]), whose "full, complete and punctual observance, payment and performance and satisfaction" of those obligations is "absolutely, unconditionally, and irrevocably guarantee[d] by Guarantors."

3. To scotch precisely the kind of evasive tactics now essayed by Guarantors, Guaranty § 2 at page 3 contains a paragraph that begins "All of the remedies set forth herein and/or provided for in any of the other Loan Documents or at law or equity" and that then expressly negates any contention based on election-of-remedies principles.

4. Guaranty § 9 includes express waivers by Guarantors, among other things, (1) of the pursuit or exhaustion of remedies against the Borrower as a condition precedent to proceeding against Guarantors under the Guaranty (subsection (a)) and (2) of "any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Guaranty Agreement" (subsection (g)). Those waivers are undertaken "[t]o the extent permitted by law," and on that score such cases as *Chrysler Credit Corp. v. Marino,* 63 F.3d 574, 577 (7th Cir.1995) confirm that Illinois law—specifically controlling under the Guaranty—gives full play to freedom-of-contract principles in enforcing such express waivers.[2]

---

**1.** [Footnote by this Court] Although the Guaranty employs "Guarantor" as a singular collective noun, Guaranty ¶ 25 confirms the joint and several liability of the several Guarantors.

This opinion thus speaks of them in plural rather than singular terms.

**2.** *Chrysler Credit* is only exemplary of the Illinois caselaw, applied by both the state and

5. Guaranty § 9's broad expanse of waivers also includes another provision that might well have been written for the present case, under which Guarantor:

(c) waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property, which means, among other things:

\* \* \*

(ii) If Lender forecloses on any real property collateral pledged by Borrower or anyone else:

(A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any rights Guarantor may have to collect from Borrower or anyone else.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.

In an obvious effort to make the worse appear the better cause, Guarantors attempt to call upon the unsuccessful effort by Inland to obtain confirmation of the foreclosure sale that it pursued in Georgia. But that effort by Guarantors is at war not only with the parties' agreement that Illinois law provides the rules of decision under the Guaranty, but also with the limited scope that Georgia caselaw gives to summary confirmation proceedings there, as confirmed by caselaw that Guarantors' counsel themselves cite—as *Dorsey v. Mancuso*, 249 Ga.App. 259, 547 S.E.2d 787, 789 (2001)(citing several earlier cases) states:

Therefore, by law, a confirmation proceeding is limited to determining whether the sale was properly advertised and brought the fair market value of the land.

As reflected by this opinion's earlier quotations from and references to the Guaranty, a negative answer or a nonanswer to that "whether" question has no impact at all on Inland's rights and remedies against Guarantors—indeed, *Dorsey* itself rejected a litigant's effort to invoke collateral estoppel because of the narrow function of the confirmation proceeding.[3]

So much, then, for the straightforward enforceability of Guarantors' express and voluntarily undertaken commitments from which they strive to escape. But it is worth adding that the futility, as well as the empty content, of those efforts at escape is really underscored by a further look at those efforts on their own.

On that score, Guarantors' just-filed Reply in attempted support of its dismissal motion carries its own death warrant. In principal support of Guarantors' fallacious

---

federal courts, that consistently enforces waivers such as those contained in the Guaranty. Guarantors attempt to respond by leaning on the weak reed (really no reed at all) of what *In re L & S Indus., Inc.*, 989 F.2d 929, 934 (7th Cir.1993)(citing cases decided in 1860 and 1893) speaks of as a "general rule" and as what "is usually a good defense in a later suit against a guarantor"—but such "glittering generalities" (a term sometimes attributed to the noted semanticist Alfred Korzybski) cannot of course override the express contractual waivers that were subscribed to by Guarantors.

**3.** Guarantors' counsel try to put a different read on the *Dorsey* case, but in doing so they miss the critical and substantively dispositive point that the limited scope of such confirmation proceedings under Georgia law totally negates their efforts to bring claim preclusion or issue preclusion into play.

attempt to portray Georgia law as controlling, their Reply's Argument at 2 quotes at length from the Section 57 Legal Construction provision of the single-spaced, 32–page Deed To Secure Debt and Security Agreement—but what Guarantors' counsel impermissibly gloss over (or more accurately ignore entirely) is that the language that they quote speaks of the enforcement by lender Inland "of its foreclosure and provisional remedies against *Borrower* under this Security Deed and the Other Loan Documents," just as it goes on to specify that *"Borrower* shall comply with applicable law in the State of Georgia...." It is those obligations that are followed (understandably) by the provision that Georgia law "shall govern with respect to the creation, perfection and priority of the lien, security title and security interest of this Security Deed and the Other Loan Documents ..."—understandably because those relate to Georgia land.

But who is the "Borrower"? It is Harbin, not the Guarantors. Both that lengthy document and the lengthy promissory note secured by that Deed are signed by Harbin and not by Guarantors. What Guarantors instead agreed to do, in compliance with the requirements that Inland wanted as additional assurances of payment of the loan, was to enter into a wholly separate document—the Guaranty—in their individual capacities, undertaking personal responsibility for the payment of the loan entirely independent of and in addition to the Borrower's obligations.

In what may approach the height of irony, Guarantors conclude their Reply by characterizing Inland's position as "a final desperate attempt to enforce the guaranty." [4] Instead that pejorative label "desperate attempt" fits Guarantors' pretense that the ironclad fetters places on them by the Guaranty's numerous provisions—those cited here and others as well—do not exist. Simply put, wishing does not make it so.[5]

In sum, Guarantors' Rule 12(b)(6) motion to dismiss Inland's Complaint must be and is denied, and Guarantors are ordered to file their answer to the Complaint on or before February 10, 2012. Indeed, this Court's review of the parties' competing submissions suggests a strong unlikelihood that there are factual differences that would preclude a swift judgment as a matter of law in Inland's favor.[6] If such is indeed the case, so that the only dispute between the litigants is legal and not factual in nature, both Guarantors and their lawyers ought to pay heed to the hazards posed by Rule 11(b) and 28 U.S.C. Section 1927 by any undue prolongation of the dispute.

---

**4.** Is it an accident or a Freudian slip that leads counsel to begin "guaranty" with a lower-case "g," as though to wipe away the fact that the Guaranty is a formal document that nails shut the coffin of personal liability on the part of Guarantors?

**5.** Just a few words should be added as to the Reply's criticism of the opinion issued by this Court's colleague Honorable Samuel Der–Yeghiayan in another case dealing with Georgia's confirmation statute. As Guarantors' counsel correctly point out, and as this Court regularly states in the course of its oral and written rulings, our Court of Appeals regularly (and properly) reminds us that District Judges' opinions and decisions are nonprecedential. This Court has thus not troubled itself to parse whatever similarities and differences may exist as between Judge Der–Yeghiayan's case and this one—this opinion stands on its own.

**6.** This Court is of course mindful of the possibility that a disagreement on that score as a legal (rather than factual) matter might be taken up on appeal. But that prospect does not alter what is said next in the text.

## LOAN GUARANTY AGREEMENT

THIS LOAN GUARANTY AGREE-MENT (this "**Guaranty Agreement**"), is made as of the 6th day of June, 2007, by **CHIVAS RETAIL PARTNERS, LLC,** an Arizona limited liability company, **TIM J. DOLLANDER,** an individual, **WALTER L. BROWN, JR.,** an individual, **TIM J. DOLLANDER, AS TRUSTEE OF THE TJD SEPARATE PROPERTY TRUST,** and **WALTER L. BROWN, JR., AS TRUSTEE OF THE WALTER L. BROWN, JR., REVOCABLE TRUST** (collectively "Guarantor"), to **INLAND MORTGAGE CAPITAL CORPORA-TION,** a Maryland corporation (referred to herein as "Lender").

### WITNESSETH:

WHEREAS, Guarantor has requested from Lender a loan to **Harbins Crossing TC, LLC,** a Georgia limited liability company (the "**Borrower**") in the maximum principal amount of Fifty–Nine Million Six Hundred Seventy Thousand and No/100 Dollars ($59,670,000.00) (the "**Loan**") for the purpose of providing financing for the acquisition of, and construction of certain new improvements on, that certain real estate located in the City of Dacula, County of Gwinnett, State of Georgia described on *Exhibit A* attached hereto and made a part hereof to be commonly known as Harbins Crossing retail shopping center (the "**Property**"), and it will be of substantial economic benefit to Guarantor for the Borrower, hereinafter defined, to issue. the Note (as hereinafter defined) and borrow the principal evidenced thereby, Guarantor expecting to receive, directly or indirectly, economic benefit from Borrower's involvement in the acquisition, improvement and management of the Property; and

WHEREAS, the Loan is to be evidenced and secured by, among other documents, the certain Installment Note in the princi-pal amount of $59,670,000.00 of even date herewith (as the same may be amended, modified or extended, the "**Note**") and a certain Deed to Secure Debt and Security Agreement securing payment of same, also of even date herewith (as the same may be amended from time to time, the "**Security Deed**"), which Security Deed creates a lien on the Property (the Note, the Security Deed and such other documents as are executed and delivered in connection therewith, as the same may from time to time be amended, being collectively referred to herein as the "**Loan Documents**"); and

WHEREAS, Lender is willing to extend the Loan only on the condition that Guarantor, irrevocably and unconditionally, fully guarantees to Lender the full and prompt payment and performance of the Obligations (defined below) as herein provided; and

WHEREAS, Guarantor is willing to irrevocably and unconditionally, fully guarantee the Obligations, pursuant to the terms of this Guaranty Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby covenants and agrees as follows:

1. The recitals set forth above are by this reference incorporated herein.

2. Guarantor, absolutely, unconditionally, and irrevocably guarantees the full, complete and punctual observance, payment and performance and satisfaction of all of the obligations, duties, covenants and agreements of Borrower under the Loan Documents, including, without limitation, (A) the full and prompt payment when due, whether by lapse of time, declaration, acceleration or otherwise, and at all time

thereafter, of all principal, interest, default interest, late charges, fees, expenses (including, without limitation, attorneys' fees and expenses), premiums and all other sums from time to time outstanding under the Loan Documents, and (B) with respect to the construction and completion of any item(s) of the renovation and construction work, as more particularly described in the Loan Documents (the "**Construction Work**"), free of any claim for mechanics', materialmen's or any other liens, and in accordance with applicable (1) laws, (2) plans and specifications and (3) time periods and other requirements set forth herein and in the other Loan Documents, including, without limitation, the following:

 (i) To perform, complete and pay for (or cause to be performed, completed and paid for) the Construction Work and to pay all costs of the Construction Work (including any and all cost overruns) and all other costs associated with the Construction Work (including, without limitation, the costs of any architects' and engineers' fees), if Borrower shall fail to perform, complete or pay for such work, including any sums expended in excess of the amount of indebtedness incurred by Borrower under the Loan Documents or with respect to the Loan, whether or not the Construction Work is actually completed;

 (ii) If Lender exercises its right under the Loan Documents to take possession of the Property and complete the Construction Work, to reimburse Lender for all costs and expenses incurred by Lender in excess of the applicable approved budget line items therefor (if any) in so taking possession of the Property and completing the Construction Work;

 (iii) If any mechanics' or materialmen's liens should be filed, or should attach, with respect to the Property by reason of the Construction Work, to immediately cause the removal of such liens, or post security against the consequences of their possible foreclosure and procure an endorsement(s) to the title policy insuring Lender against the consequences of the foreclosure or enforcement of such lien(s); and

 (iv) If any chattel mortgages, conditional vendor's liens or any liens, encumbrances or security interests whatsoever should be filed, or should attach, with respect to the personal property, fixtures, attachments and equipment delivered upon the Property and owned by Borrower, attached to the Property or used in connection with the construction of the improvements thereon, to immediately cause the removal of such lien(s) or post security against the consequences of their possible foreclosure and procure an endorsement(s) to the title policy insuring Lender against the consequences of the foreclosure or enforcement of such lien(s).

All payment and performance obligations described in this Section 2 shall be hereinafter collectively referred to as the "**Obligations**."

In the event of any default by Borrower in the payment or performance of the Obligations and the expiration of any applicable cure or grace period, Guarantor agrees, on demand by Lender or any holder of the Note (which demand may be made concurrently with notice to Borrower that Borrower is in default of its obligations), to pay and perform all the Obligations. Lender shall have the right, at

its option, either before, during or after commencing foreclosure or sale proceedings, as the case may be, and before, during or after pursuing any other right or remedy against Borrower or Guarantor, to pay or perform any and all of the Obligations by or through any agent, contractor or subcontractor of its selection, all as Lender in its sole discretion deems proper, and Guarantor shall indemnify, defend and hold Lender free and harmless from and against any and all loss, damage, cost, expense, injury, or liability Lender may suffer or incur in connection with the exercise of its rights under this Guaranty Agreement or the performance of the Obligations except to the extent same are suffered and incurred due to the gross negligence or willful misconduct of Lender. Furthermore, Lender shall not have any obligation to protect or insure any collateral for the Loan, nor shall Lender have any obligation to perfect its security interest in any collateral for the Loan.

During the course of any construction undertaken by Lender or any other party on behalf of Lender in accordance with the terms of this Guaranty Agreement, Guarantor shall pay on demand any amounts due to contractors, subcontractors, and material suppliers and for permits and licenses necessary or desirable in connection therewith. Guarantor's obligations in connection with such work shall not be affected by any errors or omissions of the general contractor, architect, Lender's consultant or any subcontractor or agent or employee of any of the foregoing in the design, supervision, and performance of the work, it being understood that such risk is assumed by Guarantor. Neither the completion of the Construction Work nor failure of said party to complete the Construction Work shall relieve Guarantor

of any liabilities hereunder, rather such liability shall be continuing and may be enforced by Lender to the end that the Construction Work shall be timely completed, lien-free, without loss, cost, expense, injury or liability of any kind to Lender.

All of the remedies set forth herein and/or provided for in any of the other Loan Documents or at law or equity shall be equally available to Lender, and the choice by Lender of one such alternative over another shall not be subject to question or challenge by Guarantor or any other person, nor shall any such choice be asserted as a defense, setoff, or failure to mitigate damages in any action, proceeding, or counteraction by Lender to recover or seeking any other remedy under this Guaranty Agreement, nor shall such choice preclude Lender from subsequently electing to exercise a different remedy. The parties have agreed to the alternative remedies provided herein in part because they recognize that the choice of remedies in the event of a default hereunder will necessarily be and should properly be a matter of good faith business judgment, which the passage of time and events may or may not prove to have been the best choice to maximize recovery by Lender at the lowest cost to Borrower and/or Guarantor. It is the intention of the parties that such good faith choice by Lender be given conclusive effect regardless of such subsequent developments. Notwithstanding any provision to the contrary contained in this Guaranty Agreement and/or in the other Loan Documents, Guarantor hereby defers until the date that is one year and one day from the date the Lender has received full payment of all principal, interest and other sums payable under the Loan (i) any and all rights of subrogation (whether arising under contract, 11

U.S.C. § 509 or otherwise), to the claims, whether existing now or arising hereafter, Lender may have against Borrower, and (ii) any and all rights of reimbursement, contribution or indemnity against Borrower or any future guarantors of any obligations under the Loan Documents which may have heretofore arisen or may hereafter arise in connection with any guaranty or pledge or grant of any lien or security interest made in connection with any obligations under the Loan Documents. Guarantor hereby acknowledges that the deferment contained in the preceding sentence (the **"Deferment Waiver"**) is given as an inducement to Lender to enter into the Loan Documents and, in consideration of Lender's willingness to enter into the Loan Documents, Guarantor understands and acknowledges that by virtue of this Guaranty Agreement it has specifically assumed any and all risks of a bankruptcy or reorganization case or proceeding affecting Borrower, and, as an example and not by way of limitation, a subsequent modification of the Note or any of the other Loan Documents in any reorganization case concerning Borrower shall not affect the obligations of Guarantor hereunder. Guarantor agrees that to the extent that Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required, for any of the foregoing reasons or for any other reasons, to be repaid or paid over to a custodian, trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made and Guaran-

tor shall be primarily liable for this obligation.

3. The entire outstanding principal sum together with all accrued and unpaid interest thereon, and all other payments then due under the Note and under the Security Deed and together with, to the extent permitted under applicable law, costs and expenses, including attorneys' fees and disbursements, incurred by the holder in collecting or enforcing payment thereof, shall also be and become immediately due and payable at the option of the Lender (a) if the Property, or any part thereof or any interest therein is conveyed, sold (including a sale on an installment basis or pursuant to a land sale contract) (except as permitted by the Security Deed), transferred, leased (except as permitted by the Security Deed), encumbered or assigned in any manner whether voluntarily or involuntarily without the prior written consent of the Lender hereof; or (b) in the event of any other prohibited transfer, default or any other event described in the Security Deed or any other Loan Documents causing acceleration of the maturity date of the Note.

4. This Guaranty Agreement shall be in full force and effect continuously from the date hereof to and until the date (the **"Termination Date"**) on which the Note is repaid in full and any continuing liability of Guarantor pursuant to Sections 7 and 30 of this Guaranty Agreement has been satisfied, whereupon this Guaranty Agreement shall terminate.

5. Guarantor grants Lender, in Lender's sole and absolute discretion and without notice to Guarantor, the power and authority to deal in any lawful manner with the Obligations and, without limiting the generality of the foregoing, further power and authority, from time to time:

(a) to renew, compromise, extend, accelerate or otherwise change the time or place of performance of or to otherwise change the terms of the Obligations or of any document relating thereto;

(b) to modify or to waive any of the terms of any agreement with Borrower pertaining to the Obligations;

(c) to take and hold security for the performance of the Obligations, and to exchange, enforce, waive or release any such security;

(d) to direct the order or manner of sale of any such security as Lender in its discretion may determine; and/or

(e) to grant any indulgence, forbearance, waiver or release to Borrower.

The liability of Guarantor shall not be terminated, affected, impaired or reduced in any way by any action taken by Lender under the foregoing provisions or any other provision hereof or by any delay, failure or refusal of Lender to exercise any right or remedy Lender may have against Borrower or any other person, including other guarantors, if any, liable for all or any part of the obligations guaranteed herein by Guarantor.

6. Guarantor shall not have any right of recourse against Lender by reason of any action Lender may take or omit to take under the provisions of this Guaranty Agreement or under the provisions of any of the Loan Documents.

7. Satisfaction by Guarantor of any liability hereunder incident to a particular default under the Note or under any of the other Loan Documents shall not discharge Guarantor except for the default satisfied, it being the intent hereof that this Guaranty Agreement and the obligations of Guarantor hereunder shall be continuing and irrevocable until the Termination Date. Further, if at any time all or any part of any payment received by Lender from Borrower or from Guarantor under or with respect to this Guaranty Agreement is or must be rescinded or returned for any reason whatsoever (including, but not limited to, the insolvency, bankruptcy or reorganization of Borrower or Guarantor), then Guarantor's obligations hereunder shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence, notwithstanding such previous receipt of payment by Lender, and Guarantor's obligations hereunder shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment to Lender had never been made.

8. Guarantor hereby waives notice of acceptance of this Guaranty Agreement by Lender, and this Guaranty Agreement shall immediately be binding upon Guarantor.

9. To the extent permitted by law, Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Lender to proceed against Borrower or any other person or to proceed against or exhaust any security held by Lender at any time or to pursue any other remedy in Lender's power before proceeding against Guarantor hereunder; (b) the defense of the statute of limitations in any action hereunder or in any action for the performance of the Obligations hereby guaranteed; (c) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other person or persons or the failure of Lender to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other person or persons; (d) demand, presentment for payment, notice of non-payment, pro-

test, notice of protest and all other notices of any kind, including, without limiting the generality of the foregoing, notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of Borrower, Lender, any endorser or creditor of Borrower or of Guarantor or of other guarantors or on the part of any other person whomsoever under this or any other instrument in connection with any obligation or evidence of indebtedness held by Lender as collateral or in connection with the Obligations hereby guaranteed; (e) any defense based upon an election of remedies by Lender which destroys or otherwise impairs any or all of the subrogation rights, if any, of Guarantor, the right of Guarantor to proceed against Borrower or any other person for reimbursement, or both; (f) all duty or obligation on Lender's part to perfect, protect, retain or enforce any security for the payment of the Obligations; (g) any principle or provision of law, statutory or otherwise, which is or might be in conflict with the terms and provisions of this Guaranty Agreement; (h) any duty on the part of Lender to disclose to Guarantor any facts Lender may now or hereafter know about Borrower, regardless of whether or not Lender has reason to believe that any such facts materially increase the risk beyond that which Guarantor intends to assume or has reason to believe that such facts are unknown to Guarantor or has a reasonable opportunity to communicate such facts to Guarantor, it being understood and agreed that Guarantor is fully responsible for being and keeping informed of the financial condition of Borrower and of any and all circumstances bearing on the risk that liability may be incurred by Guarantor hereunder; (i) any right or claim to cause a marshalling of the assets of Guarantor; (j) any lack of notice of disposition or of manner of disposition of any collateral for the Loan; (k) any deficiencies in the collateral for the Loan or any deficiency in the ability of the Lender to collect or to obtain performance from any persons or entities now or hereafter liable for the payment and performance of any obligation hereby guaranteed; (1) any assertion or claim that the automatic stay provided by 11 U.S.C. 362 (arising upon the voluntary or involuntary bankruptcy proceeding of Borrower or Guarantor) or any other stay provided under any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, shall operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any of its rights, whether now or hereafter required, which Lender may have against Guarantor or the collateral for the Loan; (m) any modification of the Loan Documents or any obligation of Borrower or Guarantor relating to the Loan by operation of law or by action of any court, whether pursuant to the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, or otherwise; and (n) all Guarantor's rights under O.C.G.A. § 10–7–24 and any successor statute thereto. Without limiting the generality of the foregoing, Guarantor hereby authorizes and empowers Lender in its sole discretion, without any notice or demand to Guarantor whatsoever and without affecting the liability of Guarantor hereunder, to exercise any right or remedy which Lender may have available to it, including, but not limited to, judicial foreclosure, exercise of rights or power of sale without judicial action, or taking a deed or an assignment in lieu of

foreclosure as to any collateral security for the Loan, whether real, personal or intangible property, and the Guarantor hereby waives any defense to the recovery by Lender against the Guarantor of any deficiency after such action, notwithstanding any impairment or loss of any right of deficiency or other right or remedy against Borrower. The Guarantor specifically waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Guarantor's rights of subrogation and reimbursement against Borrower. Without limiting the generality, scope or meaning of any of the foregoing or any other provision of this Guaranty Agreement, Guarantor:

(a) waives all rights of subrogation, reimbursement, indemnification, and contribution and all other rights and defenses that are or may become available to Guarantor;

(b) waives all rights and defenses arising out of an election of remedies by Lender, even though the election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation has destroyed Guarantor's rights of subrogation and reimbursement against Borrower;

(c) waives all rights and defenses that Guarantor may have because the Borrower's debt is secured by real property, which means, among other things:

(i) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower or anyone else; and

(ii) If Lender forecloses on any real property collateral pledged by Borrower or anyone else:

(A) The amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any rights Guarantor may have to collect from Borrower or anyone else.

This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's debt is secured by real property.

10. In addition to all liens and rights of setoff given to Lender by law against any property of Borrower or of Guarantor, Lender shall have a general lien on and security interest in and a right of setoff against all property of Guarantor now or hereafter in the physical possession of or on deposit with Lender, whether held in a general or special account, on deposit or for safekeeping or otherwise. Each such lien, security interest and right of setoff may be enforced or exercised without demand upon or notice to Guarantor at any time following the failure of performance by Guarantor hereunder, shall continue in full force unless specifically waived or released by Lender in writing and shall not be deemed waived by any conduct of Lender, by any failure of Lender to exercise any such right of setoff or to enforce any such lien or security interest or by any neglect or delay in so doing.

11. With or without notice to Guarantor, Lender, in Lender's sole discretion and at any time and from time to time and in such manner and upon such terms as Lender deems fit, may: (a) apply any or

all payments or recoveries from Borrower or from any other guarantor or endorser under any other instrument or realized from any security, in such manner and order of priority as Lender may determine, to any indebtedness of Borrower to Lender, whether or not such indebtedness is guaranteed hereby or is otherwise secured or is due at the time of such application; or (b) refund to Borrower any payment received by Lender upon the Obligations hereby. guaranteed without affecting in any way Guarantor's obligation or liability hereunder for payment or performance of the Obligations. Any recovery realized from any other guarantor under any other instrument shall be first credited upon that portion of the Obligations which exceeds the maximum liability of Guarantor, if any, hereunder.

12. The amount of Guarantor's liability and all rights, powers and remedies of Lender hereunder shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law or under the Loan Documents. This Guaranty Agreement is in addition to and separate and apart from the guaranty of any other guarantor of the Obligations or of any other indebtedness or obligation.

13. The liability of Guarantor under this Guaranty Agreement shall be an absolute, direct, immediate and unconditional guarantee of payment and not of collectibility. The obligations of Guarantor hereunder are independent of the obligations of Borrower and, in the event of any default hereunder, a separate action or actions may be brought and prosecuted against Guarantor whether or not Borrower is joined therein or a separate action or actions are brought against Borrower.

Lender may maintain successive actions for other defaults, Lender's rights hereunder shall not be exhausted by its exercise of any of its rights or remedies or by any such action or by any number of successive actions. If Guarantor consists of two or more persons or entities, the obligations of each person or entity hereunder are joint and several obligations and Lender may maintain a separate action or actions against each, prosecute an action or actions against either or any of them without prosecuting an action or actions against the other or may prosecute an action or actions jointly against all persons and entities. The death or dissolution of any Guarantor shall not terminate this Guaranty Agreement as to any surviving Guarantor, and shall not terminate this Guaranty Agreement as to the estate of any deceased Guarantor.

14. In the event of the dissolution, liquidation or insolvency (howsoever evidenced) of, or the institution of bankruptcy or receivership proceedings against or by the Borrower, or its beneficiary(ies), if any, or the inability of the Borrower or the beneficiary(ies) to pay debts as they mature, the Guarantor shall pay to Lender upon demand, the full amount which would be payable hereunder by the Guarantor as if all Obligations were then due and payable without regard as to whether or not any such events shall occur at a time when any of the Obligations may not then be due and payable.

15. Notwithstanding the fact that Borrower may be a corporation, a limited liability company, a joint venture or a partnership, Lender does not have to confirm or inquire into the powers of Borrower, its directors, officers, members, joint venturers, partners, associates or other agents acting or purporting to act on its behalf, Guarantor hereby representing that such

powers exist, and monies in fact borrowed from Lender in connection with the Loan in the professed exercise of such powers shall be deemed to form a part of the liabilities guaranteed, even though the borrowing or obtaining of such monies is in excess of the powers of Borrower or of the directors, officers, joint venturers, partners, associates or other agents thereof, or shall be in any way irregular or defective or informal.

16. It is expressly understood that the obligations of Guarantor hereunder are an additional and cumulative benefit given to Lender for Lender's security and as an inducement for Lender to make the Loan and in order to induce any person or persons who may be and become the holder of the Note to accept the same,

17. All payments hereunder shall be made in lawful money of the United States of America. No delay in making demand on Guarantor for satisfaction of its liabilities hereunder shall prejudice Lender's rights to enforce such liabilities.

18. Guarantor hereby makes the following warranties and representations unto Lender which shall survive the execution and delivery of this Guaranty Agreement:

(a) Any and all balance sheets, net worth statements and other financial data which have heretofore been given or may hereafter be given to Lender with respect to Guarantor did or will at the time of such delivery fairly and accurately present the financial condition of Guarantor;

(b) Guarantor has the power and authority to execute, deliver and carry out the terms and provisions of this Guaranty Agreement and has duly authorized, executed, and delivered the same; and

(c) Neither the execution and delivery of this Guaranty Agreement, nor the consummation of the transactions herein contemplated, in compliance with the terms and provisions hereof, will contravene any provision of law, statute, rule or regulation to which Guarantor is subject or any judgment, decree, franchise, order or permit applicable to Guarantor, or will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of any lien, security interest, charge or encumbrance upon any of the property or assets of Guarantor pursuant to the terms of, any indenture, mortgage, deed of trust, deed to secure debt, agreement or other instrument to which Guarantor is a party or may be bound or subject.

19. Guarantor shall pay to Lender, without demand, attorneys' fees and disbursements and all costs and other expenses which Lender expends or incurs in enforcing this Guaranty Agreement against Guarantor whether or not suit is filed, including, without limitation, all costs, attorneys' fees and expenses incurred by Lender in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceedings involving Borrower or Guarantor which in any way affect the exercise by Lender of its rights and remedies hereunder from the fifth (5th) day after written notice to Guarantor until paid to Lender, such attorneys' fees, costs and expenses shall bear interest at the default rate of interest described in the Note.

20. Any provision of this Guaranty Agreement which is unenforceable, invalid or contrary to law, or the inclusion of which would affect the validity, legality or enforcement of this Guaranty. Agreement shall be of no effect, and in such case, all the remaining terms and provisions of this Guaranty Agreement shall subsist and shall be fully effective according to the terms of this Guaranty Agreement, the same as though any such provision had not been included herein.

21. No provision of this Guaranty Agreement or right of Lender hereunder can be waived nor can Guarantor be released from Guarantor's obligations hereunder except by a writing duly executed by Lender. This Guaranty Agreement may not be modified, amended, revised, revoked, terminated, changed or varied in any way whatsoever except by the express terms of a writing duly executed by Lender and Guarantor.

22. When the context and construction so require, all words used in the singular herein shall be deemed to have been used in the plural, and the masculine shall include the feminine and neuter and vice versa. The word "person" as used herein shall include any individual, company, firm, association, partnership, corporation, trust or other legal entity of any kind whatsoever.

23. This Guaranty Agreement is a general guaranty agreement and is assignable with any and/or all of the Obligations which it guarantees and when so assigned, Guarantor shall be bound as above to the assignee(s) without in any manner affecting Guarantor's liability hereunder. The delivery of the Note for value to any person shall, without more, constitute conclusive evidence of the acceptance hereof, and of the reliance hereon by each and every holder, from time to time, of the Note.

24. The validity of this Guaranty Agreement and the obligations of Guarantor hereunder shall in no way be terminated, affected, impaired or reduced by reason of the conveyance, transfer, sale, assignment, exchange or lease of the Property, or any part thereof or any interest therein including the beneficial interest in any land trust, to any other person or by reason of the further encumbrancing of the Property or any part thereof (it being strictly understood, however, that the provisions of this Section 24 are not deemed to be a waiver of any restrictions of such acts contained in the Loan Documents, or to constitute consent to any such acts).

25. This Guaranty Agreement, and each and every part hereof, shall be binding upon the Guarantor, and each of them, jointly and severally, and upon the heirs, administrators, legal representatives, successors and assigns of each of the Guarantor, and shall inure to the pro rata benefit of each and every future holder of the Note.

26. This Guaranty Agreement has been made and delivered by the undersigned in the State of Illinois and shall be construed for all purposes and enforced in accordance with the laws of the State of Illinois and the accrual of any claim hereunder in favor of Lender shall be deemed to have caused an event to occur in the State of Illinois. Without limiting the right of the Lender to bring any action or proceeding against the undersigned or against property of the undersigned arising out of or relating to this Guaranty Agreement (an "**Action**") in the courts of other jurisdictions, the undersigned hereby irrevocably submit to the jurisdiction of (1) any Illinois state court sitting in Cook County, Illinois,

or Federal court sitting in Chicago, Illinois, or (ii) any Georgia state court sitting in Fulton County, Georgia or federal court located in Atlanta, Georgia, and the undersigned hereby irrevocably agree that any Action may be heard and determined in such state courts or in such Federal courts. The undersigned hereby irrevocably waive any rights it may have to assert that such Illinois state courts or federal court in Illinois provide either an improper or inconvenient venue. The undersigned hereby irrevocably waive, to the fullest extent possible, the defense or assertion of any inconvenient forum to the maintenance of any Action in any jurisdiction. The undersigned hereby irrevocably agrees that the summons and complaint or any process in any Action in any jurisdiction may be served on the undersigned by mailing by certified mail, return receipt requested to the address of the undersigned set forth herein or by hand delivery to a person of suitable age and discretion at the undersigned's address set forth herein. If such service is so mailed or delivered, it will be deemed complete on the date the return receipt is executed or, if no such receipt is executed, ten (10) days after the date of mailing as aforesaid, or when delivered, and the undersigned will have thirty days from such completion of service in which to respond in the manner provided by law. The undersigned may also be served in any other manner permitted by law, in which event the undersigned's time to respond shall be the time provided by law. **THE UNDERSIGNED HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTY AGREEMENT.**

27. Any notice request or demand to be given hereunder shall be in writing, and shall be deemed to have been given when placed in the United States mail, with proper registered or certified postage prepaid, return receipt requested, addressed to the party concerned at the address shown below and shall be effective the date of mailing:

To Lender:

Inland Mortgage Capital Corporation
290 I Butterfield Road
Oak Brook, Illinois 60523
Attn: Raymond E. Petersen

with a copy to:

The Inland Real Estate Group, Inc.
2901 Butterfield Road
Oak Brook, Illinois 60523
Attn: Robert Baum, Esq., General Counsel

To Guarantor:

Chivas Retail Partners, LLC
5635 North Scottsdale Road
Suite 150
Scottsdale, Arizona 85250

Tim J. Dollander
6730 East Kasba Circle
Paradise Valley, AZ 85253

Walter L. Brown, Jr.
6620 East Kasba Circle
Paradise Valley, AZ 85253
Tim J. Dollander, as Trustee of the
TJD Separate Property Trust
6730 East Kasba Circle
Paradise Valley, AZ 85253
Attn: Tim J. Dollander

Walter L. Brown, Jr., as Trustee of

the Walter L. Brown, Jr. Revocable
Trust
6620 East Kasba Circle
Paradise Valley, AZ 85253
Attn: Walter L. Brown, Jr.

provided however, that each of the foregoing addresses for notice may be changed from time to time by notice given to the other party, in the manner herein provided for.

28. This Guaranty Agreement shall constitute the entire agreement of Guarantor with Lender with respect to the subject matter hereof and no representation, understanding, promise or condition concerning the subject matter hereof shall be binding upon Lender unless expressed herein.

29. Any non-recourse provisions contained in the Loan Documents are in no event to be construed as inconsistent with or contrary to the terms and provisions of this Guaranty Agreement and in the event of any inconsistency between said non-recourse provisions and the provisions of this. Guaranty Agreement, the provisions of this Guaranty Agreement shall control.

30. Notwithstanding any payments made by or for the account of the Guarantor pursuant to this Guaranty Agreement, Guarantor shall not be subrogated to any rights of Lender until the date which is one (1) year and one (1) day from the date the Loan is paid in full. Guarantor hereby waives all rights of subrogation, indemnity, contribution, exoneration, reimbursement or other claim which Guarantor now or may hereafter have or claim against Borrower or any other person liable in any way with respect to the Obligations until the date which is one (1) year and one (1) day from the date the Loan is paid in full.

31. Subject to all of the other terms and provisions of this Guaranty Agreement, in the event of default by Borrower under the Loan Documents and the institution of foreclosure proceedings and/or security enforcement proceedings by Lender pursuant to the Loan Documents as a result of that default, Guarantor shall continue to be liable to Lender for the payment to Lender of the amount, if any, by which the Obligations at the time of the foreclosure or security enforcement sale by Lender shall exceed the actual net cash received by Lender from any party in connection with such foreclosure or security enforcement sale. The preceding sentence shall not in any event be construed to require Lender to refund to Guarantor any amounts which were paid by Guarantor pursuant to this Guaranty Agreement prior to the acceleration of the Loan and which were properly due and payable by Guarantor at the time said payments were made.

32. The obligations and liabilities of each Guarantor hereunder shall be joint and several.

33. This Guaranty Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Failure of any Guarantor to execute this Guaranty Agreement shall not make this Guaranty Agreement ineffective as to the other Guarantors.

[NO FURTHER TEXT—SEE NEXT PAGE FOR SIGNATURE]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty Agreement as of the day and year first above written in the presence of the Notary Public who has acknowledged his signature as more fully set forth below.

CHIVAS RETAIL PARTNERS, LLC, a [AZ] limited liability company

By: /s/
[TIM DOLLANDER]
Its Manager [Seal]

/s/
TIM DOLLANDER, Individually [Seal]

/s/
WALTER L. BROWN, JR., Individually [Seal]

/s/
TIM J. DOLLANDER, AS TRUSTEE OF THE WALTER L. BROWN, JR. REVOCABLE TRUST [Seal]

/s/
WALTER L. BROWN, JR., AS TRUSTEE OF THE WALTER L. BROWN, JR., REVOCABLE TRUST [Seal]

STATE OF GEORGIA)
)ss:
COUNTY OF FULTON)

I, Cynthia Mirville, a Notary Public in and for the County and State aforesaid, do hereby certify that Tim Dollander, Manager of Chivas Retail Partners, LLC, a Arizona limited liability company, personally known to me to he the same person whose name is subscribed to the foregoing instrument as such Manager, appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as the free and voluntary act of said Company, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 4th day of June, 2007.

/s/
Notary Public
My commission expires:

————

STATE OF GEORGIA)
)ss:
COUNTY OF FULTON)

I, Cynthia Mirville, a notary in and for and residing in said County' in the State aforesaid, do hereby certify that Tim J. Dollander, personally known to me to be the same person whose name subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his own free and voluntary act for the uses and purposes therein set forth.

WITNESS under my hand and notarial seal, this 4th day June of 2007.

/s/
Notary Public
My commission expires:

————

STATE OF GEORGIA)
)ss:
COUNTY OF FULTON)

I, Cynthia Mirville, a notary in and for and residing in said County in the State aforesaid, do hereby certify that Walter L. Brown, Jr., personally known to me be the same person whose name subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as his own free and voluntary

act for the uses and purposes therein set forth.

WITNESS under my hand and notarial seal, this 4th day of June, 2007.

/s/

Notary Public

My commission expires:

————

## EXHIBIT A

### *LEGAL DESCRIPTION*

All that tract or parcel of land lying and being in Land Lots 299 and 300 of the 5th Land District of Gwinnett County, Georgia, being more particularly described as follows:

Beginning at a 2 1/2 flat iron bar found on the northeasterly right-of-way of Harbins Road (having a 60 foot right-of-way at this point), said point being 398.11 feet as measured along said right-of-way from its intersection with the northerly right-of-way of Courtney Renea Drive (having a 50 foot right-of-way), said point being the TRUE POINT OF BEGINNING;

THENCE along said right-of-way of Harbins Road the following six (6) courses and distances: North 29 degrees 20 minutes 55 seconds West for a distance of 193.56 feet to a point; THENCE North 30 degrees 15 minutes 32 seconds West for a distance of 226.69 feet to a point; THENCE North 29 degrees 39 minutes 42 seconds West for a distance of 242.61 feet to a point; THENCE North 30 degrees 20 minutes 13 seconds West for a distance of 170.41 feet to a point; THENCE North 31 degrees 00 minutes 16 seconds West for a distance of 11 1.83 feet to a 1/2 inch rebar found; THENCE North 60 degrees 55 minutes 43 seconds East for a distance of 9.62 feet to a 1/2 inch rebar found, at which point said right-of-way becomes an 80 foot right-of-way; THENCE continuing along said right-of-way North 31 degrees 03 minutes 31 seconds West for a distance of 502.02 feet to a 1/2 inch rebar found; THENCE leaving said right-of-way North 56 degrees 45 minutes 20 seconds East for a distance of 400.03 feet to 1/2 inch rebar found; THENCE North 56 degrees 45 minutes 45 seconds East for a distance of 199.83 feet to a 1 1/4 inch crimp top pipe found; THENCE North 56 degrees 43 minutes 15 seconds East for a distance of 361.85 feet to a 1/2 inch rebar found; THENCE North 56 degrees 47 minutes 41 seconds East for a distance of 128.24 feet to a 1 inch square bar found; THENCE North 57 degrees 32 minutes 52 seconds East for a distance of 545.99 feet to a 1 inch open top pipe found; THENCE North 57 degrees 33 minutes 05 seconds East for a distance of 247.54 feet to a 1/2 inch rebar found on the southerly right-of-way of Georgia State Route 316 (a.k.a. University Parkway, right-of-way varies); THENCE along said right-of-way South 89 degrees 19 minutes 16 seconds East for a distance of 802.73 feet to an iron pin set at the intersection of said right-of-way and the old centerline of the roadbed for West Drowning Creek Road; THENCE leaving said right-of-way and along said centerline the following four (4) courses and distances: South 54 degrees 26 minutes 00 seconds West for a distance of 203.52 feet to a point; THENCE South 44 degrees 14 minutes 48 seconds West for a distance of 227.57 feet to a point; THENCE South 49 degrees 49 minutes 16 seconds West for a distance of 145.46 feet to a point; THENCE South 41 degrees 31 minutes 59 seconds West for a distance of 50.99 feet. to a point at the intersection of said roadbed and the centerline of Drowning Creek; THENCE leaving said roadbed and along said creek the following eighty (80) courses and distances: South 35 de-

grees 34 minutes 21 seconds East for a distance of 17.64 feet to a point; THENCE South 21 degrees 47 minutes 29 seconds East for a distance of 15.48 feet to a point; THENCE South 19 degrees 54 minutes 17 seconds East for a distance of 38.41 feet to a point; THENCE South 12 degrees 13 minutes 09 seconds East for a distance of 22.85 feet to a point; THENCE South 12 degrees 12 minutes 16 seconds East for a distance of 22.99 feet to a point; THENCE South 28 degrees 40 minutes 08 seconds East for a distance of 39.6.5 feet to a point; THENCE South 35 degrees 20 minutes 53 seconds East for a distance of 22.76 feet to a point; THENCE South 32 degrees 53 minutes 11 seconds East for a distance of 28.73 feet to a point; THENCE South 17 degrees 54 minutes 58 seconds East for a distance of 14.43 feet to a point; THENCE South 26 degrees 49 minutes 59 seconds East for a distance of 9.08 feet to a point; THENCE South 70 degrees 14 minutes 24 seconds East for a distance of 9.64 feet to a point; THENCE South 65 degrees 53 minutes 51 seconds East for a distance of 19.49 feet to a point; THENCE North 83 degrees 45 minutes 09 seconds East for a distance of 8.09 feet to a point; THENCE South 61 degrees 00 minutes 35 seconds East for a distance of 10.77 feet to a point; THENCE South 71 degrees 13 minutes 31 seconds East for a distance of 9.93 feet to a point; THENCE North 46 degrees 02 minutes 28 seconds East for a distance of 7.05 feet to a point; THENCE North 67 degrees 40 minutes 50 seconds East for a distance of 11.61 feet to a point; THENCE North 88 degrees 44 minutes 22 seconds East for a distance of 11.89 feet to a point; THENCE South 66 degrees 33 minutes 52 seconds East for a distance of 13.99 feet to a point; THENCE South 54 degrees 25 minutes 06 seconds East for a distance of 13.90 feet to a point; THENCE South 71 degrees 48 minutes 04 seconds East for a distance of 21.41 feet to a point; THENCE South 66 degrees 00 minutes 11 seconds East for a distance of 21.52 feet to a point; THENCE South 49 degrees 03 minutes 33 seconds East for a distance of 22.62 feet to a point; THENCE South 42 degrees 57 minutes 55 seconds East for a distance of 16.88 feet to a point; THENCE South 46 degrees 58 minutes 18 seconds East for a distance of 17.53 feet to a point; THENCE South 25 degrees 25 minutes 45 seconds East for a distance of 19.34 feet to a point; THENCE South 38 degrees 46 minutes 09 seconds East for a distance of 21.33 feet to a point; THENCE south 45 degrees 44 minutes 05 seconds East for a distance of 13.87 feet to a point; THENCE South 85 degrees 52 minutes 41 seconds East for a distance of 7.52 feet to a point; THENCE North 24 degrees 27 minutes 57 seconds East for a distance of 6.11 feet to a point; THENCE North 50 degrees 29 minutes 03 seconds East for a distance of 4.73 feet to a point; THENCE South 84 degrees 47 minutes 38 seconds East for a distance of 3.50 feet to a point; THENCE South 82 degrees 45 minutes 34 seconds East for a distance of 23.42 feet to a point; THENCE South 73 degrees 30 minutes 30 seconds East for a distance of 21.37 feet to a point; THENCE South 70 degrees 19 minutes 38 seconds East for a distance of 5.64 feet to a point; THENCE South 59 degrees 48 minutes 49 seconds East for a distance of 21.68 feet to a point; THENCE South 39 degrees 29 minutes 49 seconds East for a distance of 18.27 feet to a point; THENCE South 38 degrees 00 minutes 22 seconds East for a distance of 15.66 feet to a point; THENCE South 55 degrees 34 minutes 42 seconds East for a distance 12.96 feet to a point; THENCE North 66 degrees 19 minutes 29 seconds East for a distance of 11.51 feet to a point; THENCE North 81 degrees 02 minutes 43

seconds East for a distance of 9.72 feet to a point; THENCE North 48 degrees 36 minutes 05 seconds East for a distance of 7.11 feet to a point; THENCE South 69 degrees 56 minutes 26 seconds East for a distance of 5.75 feet to a point; THENCE South 82 degrees 25 minutes 07 seconds East for a distance of 24.56 feet to a point; THENCE South 74 degrees 30 minutes 45 seconds East for a distance of 19.21 feet to a point; THENCE South 84 degrees 04 minutes 42 seconds East for a distance of 13.89 feet to a point; THENCE South 60 degrees 23 minutes 49 seconds East for a distance of 15.43 feet to a point; THENCE South 67 degrees 48 minutes 39 seconds East for a distance of 29.00 feet to a point; THENCE South 54 degrees 0.7 minutes 22 seconds East for a distance of 28.26 feet to a point; THENCE South 71 degrees 56 minutes 28 seconds East for a distance of 26.97 feet to a point; THENCE South 68 degrees 50 minutes 37 seconds East for a distance of 10.37 feet to a point; THENCE South 44 degrees 29 minutes 40 seconds East for a distance of 12.47 feet to a point; THENCE south 18 degrees 59 minutes 40 seconds West for a distance of 9.97 feet to a point; THENCE South 53 degrees 02 minutes 37 seconds West for a distance of 11.39 feet to a point; THENCE South 59 degrees 41 minutes 53 seconds West for a distance of 6.66 feet to a point; THENCE South 26 degrees 15 minutes 24 seconds West for a distance of 5.51 feet to a point; THENCE South 04 degrees 07 minutes 07 seconds West for a distance of 15.87 feet to a point; THENCE South 14 degrees 25 minutes 49 seconds East for a distance of 11.11 feet to a point; THENCE South 44 degrees 45 minutes 17 seconds East for a distance of 8.96 feet to a point; THENCE South 71 degrees 47 minutes 38 seconds East for a distance of 10.39 feet to a point; THENCE North 84 degrees 28 minutes 56

seconds East for a distance of 11.12 feet to a point; THENCE South 52 degrees 43 minutes 12 seconds East for a distance of 10.61 feet to a point; THENCE South 35 degrees 04 minutes 35 seconds East for a distance of 30.50 feet to a point; THENCE South 38 degrees 27 minutes 34 seconds East for a distance of 21.18 feet to a point; THENCE South 27 degrees 36 minutes 49 seconds East for a distance of 13.78 feet to a point; THENCE South 49 degrees 27 minutes 24 seconds East for a distance of 9.16 feet to a point; THENCE South 68 degrees 12 minutes 59 seconds East for a distance of 12.82 feet to a point; THENCE South 78 degrees 43 minutes 36 seconds East for a distance of 11.70 feet to a point; THENCE North 80 degrees 14 minutes 57 seconds East for a distance of 13.11 feet to a point; THENCE South 76 degrees 44 minutes 50 seconds East for a distance of 12.36 feet to a point; THENCE South 46 degrees 07 minutes 24 seconds East for a distance of 12.58 feet to a point; THENCE South 33 degrees 20 minutes 40 seconds East for a distance of 30.40 feet to a point; THENCE South 30 degrees 24 minutes 21 seconds East for a distance of 9.80 feet to a point; THENCE North 88 degrees 55 minutes 41 seconds East for a distance of 9.18 feet to a point; THENCE North 72 degrees 44 minutes 34 seconds East for a distance of 14.09 feet to a point; THENCE North 76 degrees 52 minutes 54 seconds East for a distance of 19.11 feet to a point; THENCE South 61 degrees 22 minutes 50 seconds East for a distance of 14.47 feet to a point; THENCE South 44 degrees 05 minutes 48 seconds East for a distance of 22.45 feet to a point; THENCE South 32 degrees 47 minutes 36 seconds East for a distance of 10.56 feet to a point; THENCE South 16 degrees 57 minutes 20 seconds East for a distance of 10.19 feet to a point; THENCE leaving said creek South 59 degrees 15 minutes 51 seconds West for a

distance of 453.73 feet to a 1/4 inch rebar found; THENCE South 59 degrees 10 minutes 21 seconds West for a distance of 423.25 feet to a 1/4 inch rebar found; THENCE South 58 degrees 05 mutes 00 seconds West for a distance of 25.81 feet to a 1 inch steel rod found; THENCE South 59 degrees 37 minutes 59 seconds West for a distance of 94.12 feet to a 1/4 inch rebar found; THENCE South 59 degrees 18 minutes 21 seconds West for a distance of 1369.86 feet to a 2 1/2 inch flat iron bar found on the northeasterly right-of-way of Harbins Road, said point being the TRUE POINT OF BEGINNING.

As shown on that certain survey entitled "ALTA/ACSM Land Title Survey for: Chivas Retail Partners, LLC, an Arizona LLC, Harbins Crossing TC, LLC, a Georgia LLC, Chicago Title Insurance Company, Inland Mortgage Capital Corporation", prepared by Apalachee Land Surveying, Inc., bearing the seal and certification of Charles D. Norton, Georgia Registered Land Surveyor No. 2872, dated April 19, 2007, last revised June 4, 2007.